**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                               )
SGT. JAMES E. GINGER, et al.,   )
                               )
                Plaintiffs,    )
                               )
        v.                     )  Civil Action No. 03-2512 (EGS)
                               )
                               )
DISTRICT OF COLUMBIA, et al.,   )
                               )
                Defendants.    )
_____)
```

<u>**MEMORANDUM OPINION**</u>

Eight Canine Unit officers have brought suit against the Metropolitan Police Department ("MPD") claiming race discrimination, retaliation, and a hostile work environment based on a reorganization of the unit that occurred in 2003.  Pending before the Court is Defendants' Renewed Motion for Summary Judgment.  Upon careful consideration of the motion, response and reply thereto, the applicable law, and the entire record, the Court grants defendants' motion.

**I.    BACKGROUND**

Plaintiffs are eight District of Columbia Metropolitan Police Department officers employed in the Canine Unit of the Special Operations Division.  Am. Compl. ¶¶ 4-5; Def. District of Columbia's Statement of Material Facts as to Which There is No

Genuine Issue ("Defs.' Facts") ¶9.[1]  Plaintiffs James E. Ginger,
Paul E. Hustlar, Michael J. Lewis, Bernard D. Richardson, Mark W.
Wood, Robert M. Wigton, and Roy Potter are white.  Am. Compl.
¶ 4.  Plaintiff Sean S. LaGrand is African American.  *Id*. ¶ 5.
All of the plaintiffs were members of the same squad within the
Canine Unit (Squad 2) and supervised by Sergeant Ginger prior to
the Department's reorganization of the entire Canine Unit, which
was announced in March 2003.  Defs.' Facts ¶¶ 9, 44.

Prior to its reorganization, the Canine Unit was divided
into four squads, each with a sergeant as a supervisor.  *Id*. ¶ 8.
Squad assignments were based on individual preferences and
seniority.  *See id*. ¶ 16.[2]  Two of the squads worked the midnight
shift (8:00 p.m. to 6:00 a.m.) and two of the squads worked the
day shift (10:00 a.m. to 8:00 p.m.)  *Id*. ¶ 13.  Squad 2 worked
the midnight shift.  *Id*.  On March 6, 2003, Cathy Lanier,
Commander of the Special Operations Division, issued a memorandum
announcing that the MPD was going to reorganize the Canine Unit
so that all canine officers would work five eight-hour shifts per
week instead of four ten-hour shifts and would rotate through

---

[1] The facts in this section are undisputed by the plaintiffs
in Plaintiffs' Response to Defendants' Statement of Material
Facts as to Which There is No Genuine Issue ("Pls.' Facts"),
unless otherwise indicated.

[2] Plaintiffs contend that seniority only figured into days
off and everything else regarding squad assignments was based on
personal preference.  Pls.' Facts ¶¶ 16-17.

different shifts instead of being assigned to a permanent day or night shift.  Defs.' Facts ¶ 44.

Plaintiffs allege that the reorganization occurred because of a perception that Squad 2 was "too white" and because of a concern about how the media would react to a mostly white squad whose victims were mostly black.  Am. Compl. ¶ 11.  Plaintiffs dispute the MPD's proffered reasons for the reorganization, including the need to increase supervision, equalize workloads of squads, reduce exposure of certain squads to high-risk canine activities, ensure coverage during high-crime times, and distribute seniority more evenly across the Canine Unit.  Defs.' Facts ¶¶ 44-58. Plaintiffs instead claim that political pressure drove the defendants to break up Squad 2 in order to spread out canine bites among a more diverse officer population.  *Id.*  Prior to the reorganization, an analysis performed by an Independent Monitor selected by the Department of Justice and the MPD revealed that 11 out of 17 bites (65%) occurred with handlers in one squad -- Squad 2.  Am. Compl. ¶ 9; Defs.' Facts ¶ 29.  The analysis also revealed that Squad 2, which was involved in the majority of the bites, had a racial makeup that is predominantly white male -- 6 out of 7 officers and the sergeant are white males.  Am. Compl.  ¶ 9.[3]

_____

[3] Prior to the reorganization, the entire Canine Unit, including sergeants, totaled twenty-two whites (54%), fourteen African Americans (34%), three Hispanics (7%), one Asian American

## II.  DISCUSSION

### A. Standard of Review

This case is before the Court on defendants' renewed motion for summary judgment.  Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.  Employment Discrimination[4]

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Where there is no direct evidence of

(2.5%), and one Native American (2.5%).  Defs.' Facts ¶ 11.

[4] The plaintiffs make employment discrimination and retaliation claims under Title VII and 42 U.S.C. § 1981.  The analysis is the same for both types of claims.  *See Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1412 n.7 (D.C. Cir. 1998).

discrimination, the Court applies the *McDonnell Douglas* burden-shifting framework under which the plaintiff must first establish a prima facie case of discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If the plaintiff successfully establishes a prima facie case, the burden shifts to the defendant employer "to articulate some legitimate, non-discriminatory reason" for the employment action.  *Id.*  If the employer meets it burden, the burden then shifts back to the plaintiff to "prove by a preponderance of the evidence that the [employer's] proffered reasons are a pretext for discrimination."  *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  The *McDonnell Douglas* framework was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination."  *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

The "central focus of the inquiry" in such cases "is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'"  *George v. Leavitt*, 407 F.3d 405, 411 (D.C. Cir. 2005) (quoting *Furnco*, 438 U.S. at 577) (internal quotation marks and citations omitted).  In this case, all officers in the Canine

5

Unit were equally affected by the reorganization in that all officers were required to work rotating shifts regardless of race.  Without any showing of disparate treatment, there is no discrimination in this case.

To make out a prima facie case of disparate-treatment discrimination, a plaintiff must establish that:  (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) "the unfavorable action gives rise to an inference of discrimination."  *George*, 407 F.3d at 412 (internal quotation marks and citations omitted).  The Title VII plaintiff "carries the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on discriminatory criterion illegal under the Act.'"  *Furnco*, 438 U.S. at 476 (quoting *Teamsters v. United States*, 431 U.S. 324, 358 (1977)).  The plaintiffs in this case have failed to even meet their initial burden.

### 1.   **Membership in a protected class**

Plaintiffs allege that the MPD discriminated against them by reorganizing the entire Canine Unit as a result of Squad 2 being "too white."[5]  In reverse discrimination cases, a plaintiff must

---

[5] Even though one plaintiff in this case is black, that does not prevent him from stating a claim based on his association with the white plaintiffs who claim discrimination because of their race.  *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 574 (6th Cir. 2000) ("[I]n order to state a cognizable claim

do more than simply show that he is white in order to make out the first prong of a prima facie case of discrimination.  *Mastro*, 447 F.3d at 851.  A majority-group plaintiff alleging employment discrimination must show "additional background circumstances that support the suspicion that the defendant is that unusual employer that discriminates against the majority."  *Id.* (quoting *Harding v. Gray*, 9 F.3d 150, 153 (D.C. Cir. 1993)).  The "background circumstances" requirement "'substitutes for the minority plaintiff's burden to show that he is a member of a racial minority.'"  *Id.* (quoting *Harding*, 9 F.3d at 153).

To demonstrate background circumstances, a plaintiff must provide evidence from one of the following categories: (1) evidence indicating that the employer "'has some reason or inclination to discriminate invidiously against whites'";[6] or (2) evidence indicating that "'there is something "fishy" about the facts of the case at hand that raises an inference of discrimination.'"[7]  *Id.* (quoting *Harding*, 9 F.3d at 153).

---

under Title VII, the plaintiff himself need not be a member of a recognized protected class; he need only allege that he was discriminated [against] on the basis of his association with a member of a recognized protected class.").

[6] In this category, the D.C. Circuit has found sufficient such evidence as political pressure to promote a minority because of his race, pressure to promote minorities in general, and proposed affirmative action plans.  *Mastro*, 447 F.3d at 851.

[7] In this category, the D.C. Circuit has found sufficient evidence that a plaintiff was given little or no consideration for a promotion and that the supervisor never fully reviewed the

However, the burden of establishing "background circumstances" is "minimal," *id*. at 852, and not intended to be "an additional hurdle for white plaintiffs."  *Harding*, 9 F.3d at 154.

Plaintiffs argue that when the defendants reassigned all the officers in the Canine Unit and changed their shift assignments because of the perception that Squad 2 was "too white" and because of the fear of political and public perception, they violated Title VII.  Pls.' Opp'n at 16.  They further argue that there is enough evidence to show "additional background circumstances that support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Id*. at 22 (quoting *Mastro*, 447 F.3d at 851).  Plaintiffs argue that the defendants admit that part of the backdrop for the reorganization was defendants' concern about potential or perceived civil rights violations because a mostly white squad within the Canine Unit had more bites than other squads and the majority of victims were black.  *See* Pls.' Opp'n at 23. Plaintiffs contend that moving white officers from a permanent shift to rotating shifts with no evidence of wrongdoing and just because of perceptions about race relations shows that the

---

qualifications of the minority promotee; and evidence that a minority applicant was promoted over four objectively better-qualified white applicants in an unprecedented fashion.  *Id.* at 851-52.

defendants have "some reason or inclination to discriminate invidiously against whites."  *Id*.

Defendants counter that the Metropolitan Police Department does not have a historical background suggesting it discriminates against whites nor is there any evidence that the Department faces political pressure to treat blacks more favorably.  Defs.' Renewed Mot. for Summ. J. at 14.  Defendants argue that to the extent race was taken into account at all prior to the reorganization, it was in the context of the Department's civil rights concerns based on canine bite statistics.  *Id*.  Moreover, there is no disparity in treatment between different races in this case because every officer in the Canine Unit was subjected to the reorganization.

The fact that concern about race relations plays into decision making at a macro level when developing policies on how to reorganize a police unit is not sufficient to support the suspicion that the Metropolitan Police Department is the unusual employer that discriminates against the majority.  This case lacks a very important element:  some sort of difference in treatment among officers because of their race.

### 2.   Adverse employment action

An employee suffers an adverse employment action if he experiences "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment

opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (citing *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)).  "Mere idiosyncracies of personal preference are not sufficient to state an injury."  *Brown*, 199 F.3d at 457. "Purely subjective injuries," such as dissatisfaction with a reassignment, public humiliation, or loss of reputation, are not adverse actions.  *Forkkio*, 306 F.3d at 1131.  While a lateral transfer alone with no diminution in pay or benefits is not an adverse employment action, *Brown*, 199 F.3d at 457, "'reassignment with significantly different responsibilities, or . . . a significant change in benefits' generally indicates an adverse action."  *Forkkio*, 306 F.3d at 1131 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

Plaintiffs argue that they suffered an adverse employment action because they were forced to rotate shifts and lost their night differential.  Pls.' Opp'n at 20.  Prior to the reorganization, all plaintiffs worked the midnight shift on a permanent basis and received the night differential (4% of the officer's base pay).  *Id*.  After the reorganization, plaintiffs would only get the night differential when rotating through the night shift.  In addition, plaintiffs argue that they lost overtime opportunities when they were forced to work rotating shifts because they could not routinely testify in court during

the day.  *Id.*  Moreover, plaintiffs were precluded from maintaining other part-time work and incurred additional expenses for childcare that they did not incur prior to the reorganization.  *Id.*

Defendants argue that plaintiffs suffered no loss in pay or benefits following the reorganization and, therefore, the shift changes were akin to lateral transfers.  Defs.' Renewed Mot. for Summ. J. at 9.  Defendants also argue that any shift changes should be looked at in context.  According to the defendants, plaintiffs were routinely required to alter their schedules for special events in D.C. such as terrorist alerts, protests, and presidential details.  *Id.* at 10.  Defendants argue that because plaintiffs had frequently varying work schedules, the change from a permanent midnight shift to a rotating schedule was not an adverse employment action.  *Id.*  Defendants further argue that the loss of the night differential is not sufficient to transform a lateral transfer into an adverse employment action.  *Id.* at 11. Defendants point out that plaintiffs still earned the night differential when rotating through evening and night shifts so there was only a minimal loss in pay.  *Id.*  Finally, defendants argue that plaintiffs still have tons of opportunities for overtime but choose not to work as much overtime now that they have switched to the rotating shifts.  Defs.' Reply at 4.

*Freedman v. MCI Telecomms. Corp.*, 255 F.3d 840 (D.C. Cir. 2001), appears to be directly on point.  In *Freedman*, the plaintiff argued that he suffered an adverse employment action when he was transferred from the day shift to the night shift. The D.C. Circuit suggested in dicta that the transfer was an adverse employment action:

> Thus, it is not enough to ask whether the transfer was purely lateral.  We must also ask if other changes in terms, conditions, or privileges followed from the transfer.  It is hard to say that transfer to the night shift would not constitute such a change, at least in conditions or privileges.  Freedman testified that the change in hours interfered with his education. Further, the fact that Freedman received a pay differential for working on the night shift does not, as the district court held, necessarily demonstrate that he was not adversely affected by the change. Rather, it could demonstrate that the night shift was an undesirable assignment.

*Id*. at 844.  Similar to *Freedman*, it is hard to say that a change from a permanent midnight shift to a rotating shift where one's schedule changes every month is not a change in the conditions or privileges of employment sufficient to constitute an adverse employment action.

### 3.   Inference of discrimination

One way a plaintiff can satisfy the third prong of the prima facie test is by establishing that "she was treated differently from similarly situated employees who are not part of the protected class."  *George*, 407 F.3d at 412.  Although the Circuit Court has held that showing different treatment than similarly

situated employees is not the only way to establish the third

prong of the prima facie test, *see George*, 407 F.3d at 412,[8] an

employee alleging discrimination based on changed conditions or

terms of employment must make some sort of showing that the

change affected him in some way different from other employees.

*See Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405,

2410 (2006) ("No one doubts that the term 'discriminate against'

refers to distinctions or differences in treatment that injure

protected individuals.").  If every single employee in a racially

diverse Canine Unit faces the same change in the terms and

conditions of his employment after a reorganization, there are no

"distinctions or differences in treatment."  Under such

circumstances, it is difficult to see how the reorganization

somehow gives rise to an inference of discrimination.

Plaintiffs argue that the record is replete with evidence

that race was a reason for the "so-called reorganization."  Pls.'

Opp'n at 17.  They point to evidence that higher level police

officials were concerned about the racial make up of the squads

---

[8] In failure to hire cases, a plaintiff meets the burden of
demonstrating an inference of discrimination if he establishes
that the failure to hire is not attributable to "an absolute or
relative lack of qualifications or the absence of a vacancy in
the job sought."  *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir.
2002) (internal citation and quotation marks omitted).  In an
unlawful discharge case, a plaintiff can demonstrate an inference
of discrimination by demonstrating that the discharge was not
attributable to "performance below the employer's legitimate
expectations or the elimination of the plaintiff's position
altogether."  *George*, 407 F.3d at 412.

when they decided to undertake the reorganization and that those
officials took race into account when realigning the squads.  *Id*.
at 18.  Defendants counter that all officers in the Canine Unit
equally experienced the reorganization, and without any disparate
treatment, there can be no inference of discrimination.  Defs.'
Reply at 2.  Given that some sort of different treatment is at
the heart of a discrimination claim, plaintiffs' arguments fail.

### C.   Retaliation

Under Title VII, it is unlawful for an employer to
discriminate against an employee because that employee "opposed
any practice" made unlawful by Title VII, or because he "has made
a charge, testified, assisted, or participated in any manner in
an investigation, proceeding, or hearing" under Title VII.  42
U.S.C. § 2000e-3(a).  In order to make out a prima facie case of
retaliation, a plaintiff must show that (1) he engaged in a
statutorily protected activity; (2) the employer took an adverse
action against him; and (3) there is a causal connection between
the two.  *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003).
The plaintiff must show that a reasonable employee would have
found the challenged action to be "materially adverse," meaning
it "well might have 'dissuaded a reasonable worker from making or
supporting a charge of discrimination.'"  *Burlington Northern &
Santa Fe Ry.*, 126 S. Ct. at 2415 (quoting *Rochon v. Gonzales*, 438
F.3d 1211, 1219 (D.C. Cir. 2006) (citation omitted)).  A

plaintiff can satisfy the causal connection requirement by showing that "'the employer had knowledge of the employee's protected activity, and . . . the adverse personnel action took place shortly after that activity.'" *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 89 (D.C. Cir. 1985)).

The *McDonnell Douglas* burden-shifting framework applies to retaliation claims. *See Broderick v. Donaldson*, 437 F.3d 1226, 1231-32 (D.C. Cir. 2006). If a plaintiff is able to establish a prima facie case of retaliation, there is a presumption of unlawful discrimination and the burden shifts to the defendant to rebut the presumption by asserting a legitimate, non-discriminatory reason for its actions. *Smith v. Dist. of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005). Once the defendant does so, the Court must determine "whether a reasonable jury could infer intentional discrimination from the plaintiff's prima facie case and any other evidence the plaintiff offers to show that the actions were discriminatory or that the non-discriminatory justification was pretextual." *Id.* (internal quotation marks and citations omitted).

There is no dispute that plaintiffs engaged in a statutorily protected activity when they filed a complaint with the EEOC on April 21, 2003. However, defendants argue that the plaintiffs did not suffer an adverse employment action and/or cannot show a

causal connection between any adverse employment action and the filing of the EEOC complaint.  Defs.' Renewed Mot. for Summ. J. at 21-24.

Plaintiffs allege the following acts of retaliation: (1) rotating shifts beginning in June or July 2003; (2) Officer Wigton was assigned day work for further training without justification; (3) Officer Wood had a canine bite that was determined to be justified, yet was still recommended to attend a class that did not exist; (4) Officer LaGrand was recommended for (but not actually subjected to) adverse action in May 2003 because of a canine bite that occurred in June 2002; (5) Sergeant Ginger had a canine bite in January 2005 for which he was told further investigation was needed and he claims that nothing inappropriate occurred; (6) Officer Wood was off for a week instead of the normal three days for an investigation and, according to Sergeant Ginger, only brought back because Sergeant Ginger said the Department's actions against Wood looked like retaliation; (7) a complaint filed against Officer LaGrand by a citizen who got a parking ticket was handled by the Office of Professional Responsibility, Internal Affairs Division ("IAD") instead of the Bureau of Traffic Adjudication ("BTA"), resulting in an allegation against Officer LaGrand;[9] (8) Officer Potter was

_____

[9] An officer is placed in an early warning tracking system after three allegations.  LaGrand Dep. at 112.

16

assigned Tuesdays and Wednesdays off instead of having at least one weekend day shortly after the filing of the EEOC complaint. Pls.' Opp'n at 27-28.[10]  None of these allegations are sufficient for plaintiffs' retaliation claim to survive summary judgment.

Plaintiffs cannot show a causal connection between the shift changes that the entire unit faced and the filing of their EEOC complaint.  Plaintiffs do not dispute that the decision to rotate shifts was announced on March 6, 2003, a month and a half before they filed their EEOC complaint.  To establish a causal connection, the adverse connection must take place *after* the employee's protected activity.  *See Holcomb*, 433 F.3d at 903.

Sergeant Ginger's claim that he was investigated for a canine bite that occurred in January 2005 also is not sufficient to establish the required causal connection to make out a prima facie case of retaliation.  This investigation did not occur

---

[10] In addition to the claims delineated above, Officer Richardson claimed in response to interrogatories that he was retaliated against because he was investigated twice for overtime fraud by Internal Affairs and there were times when supervisors would not sign his overtime slips.  *See* Pls.' Opp'n at 32 (hostile work environment section of brief).  Plaintiffs do not address these claims in the section of their opposition brief discussing retaliation.  As discussed in this Memorandum Opinion, mere investigations are not sufficient to support a retaliation claim.  Moreover, plaintiffs offer no evidence suggesting that these incidents were tied to the filing of an EEOC complaint or this lawsuit.  Finally, plaintiffs offer no evidence to rebut defendants' legitimate explanation that only a lieutenant or other official, and not a sergeant, could sign overtime slips when an officer was under investigation for overtime fraud.  *See* Defs.' Reply at 14.

until over a year and a half after the plaintiffs filed their
EEOC complaint and a year after the first complaint was filed in
this Court.  Too much time elapsed to establish a causal
connection.  To qualify as a causal connection, the temporal
proximity between the employer's knowledge of the protected
activity and the adverse personnel action must be "very close."
*Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)
(noting that a three- or four-month lapse between a protected
activity and an adverse action is insufficient to show a causal
connection and that a 20-month period suggests "no causality at
all").

Plaintiffs also cannot establish a prima facie case of
retaliation based on investigations into their conduct.  The mere
initiation of an investigation into a plaintiff's conduct is not
an adverse employment action when it has no effect on the
plaintiff's employment.  *See Runkle v. Gonzales*, 391 F. Supp. 2d
210, 226-27 (D.D.C. 2005); *Ware v. Billington*, 344 F. Supp. 2d
63, 76 (D.D.C. 2004) ("[A]lthough the discipline imposed as a
result of an investigation may have a sufficiently adverse effect
on plaintiff's employment to be actionable, the mere initiation
of the investigation does not."); *Mack v. Strauss*, 134 F. Supp.
2d 103, 114 (D.D.C. 2001), *aff'd*, 2001 WL 1286263 (D.C. Cir.
Sept. 28, 2001) ("[M]ere investigations by plaintiff's employer
cannot constitute an adverse action because they have no adverse

18

effect on plaintiff's employment."). Moreover, plaintiffs do not dispute that none of the investigations into their conduct that occurred after the reorganization have resulted in discipline or suspension. Defs.' Facts ¶ 72; Pls.' Facts ¶ 72.

Similarly, the allegation against Officer LaGrand is not sufficient to support a claim for retaliation. First, the allegation would only result in disciplinary action if Officer LaGrand were to receive two additional allegations at some point in the future. The single allegation is not an adverse employment action sufficient to support a claim of retaliation. *See Romero-Ostolaza v. Ridge*, 370 F. Supp. 2d 139, 150 (D.D.C. 2005) (finding that placement on an Employee Proficiency Program or "EPP" was not an adverse employment action even though plaintiff could possibly face demotion, termination, or reassignment at some point in the future if the plaintiff failed to meet the requirements of EPP).

Sergeant Ginger's claim that Officer Wood had to spend a week or so on leave pending the conclusion of an investigation into a canine bite instead of the normal three days is also not sufficient to establish a claim of retaliation. Plaintiffs do not state any evidence from Officer Wood substantiating this claim. Moreover, there is no suggestion by either Officer Wood or Sergeant Ginger that Officer Wood suffered any loss in pay, benefits or job responsibilities as a result of the time off or

the investigation.  *See Dickerson v. Sectek, Inc.*, 238 F. Supp. 2d 66, 80 (D.D.C. 2002) (finding "no compelling reason to conclude that short suspensions that leave no lasting effect on either the employee's present or future position or her pocketbook are adverse employment actions").

The mere fact that someone in the Department recommended that Officer Wood go to a class after having a canine bite is certainly not the kind of action that a reasonable employee would find materially adverse.  Officer Wood was never even required to attend the class.  *See* Ginger Dep. at 101-02.

Sergeant Ginger's assertion that he thought it was "ridiculous" that Officer Wigton was put on day work for further training, *see* Ginger Dep. at 101, is also not sufficient for the Court to find that this training was materially adverse or that a reasonable employee would be dissuaded from reporting discrimination.  Plaintiffs have not offered any statements from Officer Wigton regarding this training and Sergeant Ginger indicated that he could not answer any questions about Officer Wigton's training.  *Id*.  Sergeant Ginger's personal opinion that the additional training for Officer Wigton was ridiculous is not sufficient to make out a prima facie case of retaliation.

Even assuming that requiring employees to take days off in the middle of the week when they previously had at least one weekend day off could be considered an adverse employment action

sufficient to make out a prima facie case of retaliation, plaintiffs have failed to provide evidence that the Department's legitimate, non-discriminatory reasons for assigning weekdays off were pretextual.  The plaintiffs do not dispute that, following the reorganization, the Canine Unit suffered shortages of officers on the weekends.  Defs.' Facts ¶ 69.[11]  In a memorandum issued on May 22, 2003, Commander Lanier informed the *entire* Special Operations Division (of which the Canine Unit is a part) that because of a lack of officers working on Saturdays and Sundays, two squads from every Branch would be formed that would have middle of the week days off and that these squads would be formed "strictly by seniority."  Memorandum from Commander Cathy Lanier to All Members of the Special Operations Division (May 22, 2003), Ex. S to Defs.' Renewed Mot. for Summ. J.  Plaintiffs provide no evidence that they were forced to have days off in the middle of the week when other officers were not.  Moreover, plaintiffs' own statements confirm that seniority determined days off.  *See* Ginger Dep. at 127 (Q:  But because of your seniority, you have always kept a weekend day off?  A:  Because I'm a senior sergeant, I got what days off I wanted–yes.");  Wigton Dep. at 55 (agreeing that days off were determined by seniority).  Therefore, plaintiffs cannot show pretext.

---

[11] Plaintiffs allege that there were shortages on weekdays and weekends after the reorganization, Pls.' Facts ¶ 69.

### D.   Hostile Work Environment

A workplace is hostile for purposes of Title VII only when
"the workplace is permeated with discriminatory intimidation,
ridicule, and insult that is sufficiently severe or pervasive to
alter the conditions of the victim's employment and create an
abusive working environment." *George*, 407 F.3d at 416 (quoting
*Onacle v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78
(1998)) (citations and internal quotation marks omitted).  The
conduct must be "extreme" to constitute a change in the terms or
conditions of employment. *Faragher v. City of Boca Raton*, 524
U.S. 775, 788 (1998).  In determining whether the workplace is
sufficiently hostile or abusive to violate Title VII, "courts
should consider the frequency of the harassing conduct, its
severity, whether it is physically threatening or humiliating,
and whether it unreasonably interferes with an employee's work
performance." *Stewart v. Evans*, 275 F.3d at 1133-34 (D.C. Cir.
2002) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-23
(1993)).  "'[S]imple teasing,' . . . offhand comments, and
isolated incidents (unless extremely serious) will not amount to
discriminatory changes in the 'terms and conditions of
employment.'" *Faragher*, 524 U.S. at 788 (citation omitted).
Moreover, "[e]xcept in extreme circumstances, court have refused
to hold that one incident is so severe to constitute a hostile
work environment." *Stewart*, 275 F.3d at 1134.  "Even a few

22

isolated incidents of offensive conduct do not amount to actionable harassment." *Id*.

In this case, plaintiffs have failed to allege any conduct that is sufficiently severe or pervasive to constitute a hostile work environment.  Plaintiffs's hostile work environment claim principally relies on the following: (1) a drawing placed on Squad 2's locker that depicts members of the squad as KKK members and has written on the bottom "The Good Ol' Day's"; (2) the words "KKK," "Whitey Rules," or "The Good Ol Boy Squad" written on the chalkboard; (3) receiving Nazi salutes from coworkers; (4) silent treatment by other officers; (5) general racist stigma and blame for reorganization by other officers; (6) refusal to sign Officer Richardson's overtime slips.

Whether considered in isolation or taken together, these incidents do not provide sufficiently severe or pervasive conduct to support a hostile work environment claim.  *See Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 844 (8th Cir. 2002) (finding that "sporadic racially-motivated misconduct by [plaintiff's] coworkers was neither severe nor pervasive enough to create a hostile work environment") (citation and internal quotation marks omitted).  Plaintiffs do not allege that any of these incidents were physically threatening, nor do they provide any information about the frequency with which these incidents occurred.  This is not the type of conduct that is so extreme

that it constitutes a change in the conditions or terms of employment.

Moreover, the Department can only be held liable for harassment of the plaintiffs by fellow employees "if the employer knew or should have known of the harassment and failed to implement prompt and appropriate corrective action." *Curry v. Dist. of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999).  With the exception of the refusal of Officer Richardson's supervisors to sign his employment slips, plaintiffs do not dispute that all of the other instances of alleged conduct giving rise to their hostile work environment claims came from fellow employees.  *See* Pls.' Opp'n at 36.[12]  As for the writing on the chalkboard of racist sayings, Officer Richardson immediately erased these sayings and did not report them to anyone.  *See* Defs.' Renewed Mot. for Summ. J. at 27.  Therefore, the employer could not reasonably have been expected to know of these incidents or take action against them.  Regardless, such anonymous written racial epithets are insufficient to establish a hostile work environment claim.  *See Woodland*, 302 F.3d at 844 (holding that racist graffiti -- drawings of "KKK," a swastika, and a hooded figure -- removed from restroom walls was insufficient to establish a hostile work environment).

---

[12] Plaintiffs fail to provide sufficient allegations or evidence to suggest that the refusal to sign overtime slips was connected to race or any protected activity.

Although there is some dispute about the adequacy of the investigation into the KKK drawing, there is no dispute that the Department's Office of Internal Affairs ("OIA") did conduct an investigation.  Moreover, no further such drawings were ever reported.  Regardless, of the adequacy of the investigation, the anonymous placement of such a drawing on the squad's locker on one occasion is not the type of extreme conduct that gives rise to a hostile work environment claim.

### E.   D.C. Human Rights Act Claims

In addition to their federal claims, plaintiffs allege violations of the District of Columbia Human Rights Act ("DCHRA").  DCHRA and federal discrimination claims are analyzed under the same legal standard.  *See Price v. Washington Hosp. Ctr.*, 321 F. Supp. 2d 38, 47 (D.D.C. 2004); *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 802 (D.C. 2003).  Because plaintiffs federal claims fail, their DCHRA claims cannot survive either.

### III. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment.  An appropriate order accompanies this Memorandum Opinion.


Signed:    **Emmet G. Sullivan**
           **United States District Judge**
           **March 5, 2007**

25